**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MUKAND L. ANEJA

**Plaintiff,**

v.

M.A. ANGELIADES, INC.,

**Defendant.**

Civil Action No.: 05-cv-9678

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND FOR FEES**

---

**RESNICK NIRENBERG & SIEGLER**
100 Eagle Rock Avenue, Suite 301
East Hanover, New Jersey 07936
(973) 781-1204
Attorney for Plaintiff, Mukand L. Aneja

On the Brief:
Jonathan I. Nirenberg, Esq.
Kathleen M. Ryder, Esq.

# <u>TABLE OF CONTENTS</u>

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    I.     Defendant Prefers Greek and Other Caucasians in Management Positions  . . . . . .  1

    II.    Aneja's Background and Experience  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    III.   Aneja's Job History With Defendant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    IV.   Defendant's Three Inconsistent Explanations For Firing Aneja  . . . . . . . . . . . . . .  6

**LEGAL ARGUMENT**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    I.     Defendant's Motion Should Be Denied Because it Failed to Comply with
Local Civil Rule 56.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    II.    Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    III.   Defendant Terminated Aneja Because He Was Indian and 67 Years Old  . . . . . . . .  9

          A.    Aneja Established a *Prima Facie* Case of National Origin and Age
Discrimination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

          B.    A Jury Can Infer Pretext for Discrimination Because Defendant's Proffered
Reason for Firing Aneja is Weak, Implausible, Inconsistent and
Contradictory  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

               1.    A Jury Can Infer Pretext Because Defendant Has Offered
Inconsistent and False Explanations for Firing Aneja  . . . . . . . . . .  13

               2.    A Jury Can Infer Pretext Because Defendant Never Asked the TA to
Waive the Specifications Defendant Always Knew Aneja Did Not
Meet  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    IV.   Aneja Established a *Prima Facie* Case of Discriminatory Disparate Pay  . . . . . . . . .  16

          A.    Defendant Paid Aneja Substantially Less Than Similarly Situated Project
Managers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

          B.    Even Assuming Aneja Was Not a Project Manager, Defendant Paid Him
Less Than Its Assistant Project Managers/Project Engineers  . . . . . . . . . .  18

          C.    Defendant Underpaid Aneja Even in Comparison To Its Quality
Managers/Engineers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    V.    Defendant is Not Entitled to Attorney's Fees  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

A.     Defendant's Application for Attorney's Fees Should Be Denied as
Premature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

B.     Defendant's Application for Attorney's Fees Should Be Denied
Because Aneja Has a Valid Claim of National Origin and Age
Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

# TABLE OF AUTHORITIES

**CASES**:

Abdu-Brisson v. Delat Air Lines, Inc.,
239 F.3d 456 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Belli v. Pendergast,
191 F.3d 129 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 17

Bickerstaff v. Vassar College,
196 F.3d 435 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Bickhardt v. Ratner,
871 F.Supp. 613 (SDNY 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Byrnie v. Town of Cromwell,
243 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Chambers v. TRM Copy Ctrs. Corp.,
43 F.3d 29 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Chertkova v. Connecticut General Life Ins. Co.,
92 F.3d 81 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Christianburg Garment Co. v. Equal Employment Opportunity Comm'n,
434 US 412 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Cook v. Arrowsmith Shelburne, Inc.,
69 F.3d 1235 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Cronin v. Aetna Life Ins. Co.,
46 F.3d 196 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Cruse v. G & J USA Publ'g,
96 F.Supp.2d 320 (SDNY 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Cush-Crawford v. ADCHEM Corporation,
234 F.Supp.2d 207 (EDNY 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Environmental Defense Fund, Inc. v. Environmental Protection Agency,
672 F.2d 42 (D.C.Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Financial, Inc.,
438 F.Supp.2d 348 (SDNY 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 17

Gallo v. Prudential Residential Services, Ltd. Partnership,
22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Giannullo v. City of New York,
322 F.3d 139 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Graham v. Long Island R.R.,
230 F.3d 34 (2d. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Hargett v. National Westminister Bank, USA,
78 F.3d 836 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Haskell v. Kaman Corp.,
743 F.2d 113 (2d Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 12

James v. N.Y. Racing Ass'n,
233 F.3d 149 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

LeBlanc-Sternberg v. Fletcher,
143 F.3d 765 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Lennon v. New York City,
392 F.Supp.2d 630 (SDNY 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8, 9

Leopold v. Baccarat, Inc.,
174 F.3d 261 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

O'Keefe v. Arbon Equipment Corporation,
399 F.Supp.2d 478 (SDNY 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Quarless v. Bronx-Lebanon Hosp. Ctr.,
228 F.Supp.2d 377 (SDNY 2002), aff'd,
75 Fed. Appx. 846 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Reeves v. Sanderson Plumbing Prods., Inc.,
530 US 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 13-16

Residential Funding Corp. v. Degeorge Financial Corp.,
306 F.3d 99 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Schnabel v. Abramson,
232 F.3d 83 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,
391 F.3d 77 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Tarshis v. Riese Organization,
211 F.3d 30 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Taylor v. Brentwood Union Free Sch. Dist.,
143 F.3d 679 (2d Cir. 1998), cert. denied,
525 US 1139 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Tomaka v. Seiler Corp.,
66 F.3d 1295 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Vergara v. Yonkers Pub. Schs.,
386 F.2d 377 (SDNY 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Washington v. Garrett,
10 F.3d 1421 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Windham v. Time Warner, Inc.,
275 F.3d 179 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Woodman v. WWOR-TV, Inc.,
411 F.3d 69 (2d. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Zimmermann v. Assocs. First Capital Corp.,
251 F.3d 376 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 10

**RULES**:

Local Civil Rule 56.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

## STATEMENT OF FACTS

**I.      Defendant Prefers Greek and Other Caucasians in Management Positions**

Defendant is a construction general contractor that does a large percentage of its business

for the New York City Transit Authority (the "TA").   (Redmond Aff. ¶ 4).   Defendant is owned by

Merkouris Angeliades, who is Greek.   (Malakidis Dep. 7:16-20, 8:13-15).   The other three members

of Defendant's upper management are also Greek.   (Malakidis Dep. 11:3-18).

The next level of Defendant's Management, the individuals who manage its work sites, are

predominately Caucasian and disproportionately Greek.[1]   Of Defendant's 16 Project Managers,

Assistant Project Managers/Project Engineers, and Quality Managers/Engineers, six (37.5%) are

Greek, and a total of 10 (62.5%) are Caucasian.   (Malakidis Dep. 8:16-10:10; Ex. G-I).   Those

Assistant Project Managers/Project Engineers ranged from 26 to 28 years old.   (Id.).

Project Managers are responsible for the "execution of the project, which involves hiring

subcontractors, administering subcontracts, administering the account with the owner, overseeing

the coordination of the trades, permitting processes, communication with the owners,

subcontractors, architects, engineers, building department approvals."   (Malakidis Dep. 13:15-25).

Every one of Defendant's Project Mangers, which is its most prestigious and highest paid position,

were Caucasian, and more than half of its Project Managers were Greek.   (Ex. G-I).   Other than two

employees who are Croatian, all of Defendant's Assistant Project Managers/Project Engineers, the

next most prestigious positions, were Greek.   (Id.).   Defendant paid its Project Managers an average

of $123,516 in total annual compensation (salary, bonus and expense allowance), and paid its

Assistant Project Managers an average of $94,625 in total annual compensation.   (Id.).

In contrast, of Defendant's eleven lower management employees, only one is either Greek

---

[1]  The statistical evidence set forth herein is based on the information Defendant provided, which is limited to employees on the projects on which Aneja worked and the Three Historic Stations Project.

or Caucasian.  (Ex. G-I).  The average annual compensation Defendant paid its Quality

Managers/Engineers was $91,166, and the average annual compensation of all other junior

managers was only $71,425.  (Id.).

 While working for Defendant, Aneja's compensation included an annual salary of $82,500,

which remained constant throughout his employment, an annual bonus of approximately $2,000,

$150 in weekly expense reimbursement, and a 401(k) account with a match of equal to 3% of his

annual salary.  (Aneja Dep. 104:6-13, 106:2, 108:2-9, 109:19-110:3).

 II. **Aneja's Background and Experience**

 Aneja is Indian.  (Aneja Dep. 13:20-21).  As of May 7, 2004, when Defendant fired him, he

was a few weeks shy of his 67th birthday.  (Aneja Dep. 159:19-21; Aneja Aff. ¶ 2).

 Aneja obtained a B.S. Degree in Civil Engineering from the University of Nebraska and a

Professional Engineer license in approximately 1990, and has taken classes toward a Masters in Civil

Engineering/Structural Engineering and an MBA degree. (Aneja Dep. 27:4-15, 28:12-24, 32:18-33:6,

39:11-17).

 Early in his career, Aneja worked as a design engineer at several different companies.  (Aneja

Dep. 29:6-32:18).  He then spent 18 years at Burns & Roe working on government projects in a

variety of positions including Senior Design Engineer, Cognizant Engineer and Assistant Section

Manager.  (Aneja Dep. 32:14-38:15, 62:8-9).  Aneja then spent two years working in the capacity of a

Project Manager for Burns & Roe subcontractors and worked as a Resident Engineer for a TA

project, and then as a Design Integration Manager.  (Aneja Dep. 38:20-39:6, 41:21-23, 43:5-44:12,

72:13-18).  Starting in 1994, Aneja worked for an affiliate of the TA as a Facility Engineer.  (Aneja

Dep. 18:8-20, 64:8-13).

### III.    Aneja's Job History With Defendant

As of 1996, Aneja was working for L.A. Wenger ("Wenger") as the TA's contractual Project Manager on the 161st Street Station/Yankee Stadium Project.  (Aneja Dep. 64:24-25, 66:14-17, 90:17-22).  Defendant was selected to take over the Yankee Stadium Project after Wenger defaulted in 2000.  (Muqtadir Dep. 11:18-22).

Because of the complexity and size of the Yankee Stadium Project, there were three Project Managers assigned when Defendant took over the project, Aneja, Jim Steers and Richard Verona. (Malakidis Dep. 27:3-5, 28:7-8; Aneja Dep. 97:2, 113:5-11, 115:5-13; Aneja Aff. ¶3).  Defendant added Anthony Antoniou as a fourth Project Manager in August 2000. (Aneja Aff. ¶3).

Of the four Project Managers on the Yankee Stadium Project, Aneja had the most experience and was called the "Senior Project Manager."[2]  (Aneja Aff. ¶4; Malakidis Dep. 27:3-5). Although Aneja was not the contractual Project Manager when he worked for Defendant, he had more responsibility than the other three Project Managers and undertook the most important and most difficult assignments, including writing contracts, supervising and coordinating payment of subcontractors and coordinating and resolving problems relating to the escalators and elevator 3/Tower A.  (Aneja Dep. 90:19-22, 111:7-112:6, 222:17-24; Pappas Dep. 84:15-87:9, 101:11-103:8; Aneja Aff. ¶4).

During the Yankee Stadium Project, several of Defendant's Project Managers were removed or resigned, including Steers, Antoniou, Verona and Bill Speleotes.  (Aneja Aff. ¶¶5, 7).

Aneja did a good job as the Senior Project Manager on the Yankee Stadium Project. (Pappas Dep. 36:8-37:11).  Aneja testified that one of the reasons Wenger defaulted on the project

---

[2]  While there is no official TA job title of "Senior Project Manager," Defendant often uses this title internally for its more senior Project Managers.  (Ex. K, 113:14-20; Malakidis Dep. 25:12-21, 91:18-25; Pappas Dep. 7:22-8:20).

was because he followed Wenger's instruction and aggressively pursued its claims against the TA, which, as he predicted, contributed to the project being delayed.  (Aneja Dep. 79:17-22, 130:10-131:9).  He had no fault in Wenger defaulting.  (Aneja Dep. 93:14-17, 96:3-6, 127:25-131:11).

After the Yankee Stadium Project was completed, Aneja served as the Quality Manager/Engineer on the A-Line Tunnel Lighting Structural Project.  (Malakidis Dep. 74:15-19).  In addition to serving as the contractual Quality Manager on that project, Aneja performed project management duties including negotiating change orders and processing payments.  (Aneja Aff. ¶10).  Aneja did a good job as the Tunnel Lighting Project's Quality Manager.  (Balagangeyan Dep. 6:24-8:7, 8:5-7, 11:20-12:12, 16:11-16).  In fact, the TA would have been satisfied if he had been assigned as the Quality Manager or Project Manager on another one of its projects.  (Balagangeyan Dep. 38:24-39:7, 43:23-44:4).

In August 2003, Defendant proposed Aneja as the Quality Engineer on a new and more complex TA project, the Myrtle Wycoff Project.  (Malakidis Dep. 82:2-16, 83:5-6).  In approximately September 2003, Defendant removed Aneja from the Tunnel Lighting Project and replaced him with Naweed Chaudri.  (Malakidis Dep. 81: 23-25, 82:17-25).  At the time, Chaudri was 48 years old and was substantially less experienced than Aneja.  (Malakidis Dep. 82:12-83:10).

Dimitrios Malakidis, Defendant's Executive VP, claims he removed Aneja as the Quality Control Engineer on the Tunnel Lighting Project because he thought the TA was more likely to accept Defendant's proposal with Aneja as the Quality Engineer since he was more experienced.  (Malakidis Dep. 81:23-82:16, 83:4-10).  Malakidis also testified that he wanted to put Chaudri on the Tunnel Lighting Project so he could obtain five years of experience as a Quality Engineer.  (Malakidis Dep. 82:12-83:10).  The TA did not want Defendant to replace Aneja on the Tunnel Lighting project.  (Balagangeyan Dep. 16:11-16).

4

The TA publishes written specifications for the key positions on each of its projects, including Quality Engineer and Project Manager.  (Balagangellan Dep. 44:5-25, 45:4-5; Muqtadir Dep. 58:2-13).  Those specifications vary from project to project.  (Id.).  A general contractor that has experience on TA projects would know the specifications for a project before it proposes employees for those positions.  (Id.).  The TA often waives some of the requirements for a particular job.  (Aneja Aff., ¶8; Aneja Dep. 146:23-147:2).  For example, the TA waived a requirement of five year's of experience the first time it made Larry Pappas a contractual Project Manager.  (Pappas Dep. 44:9-18).

Although Aneja was missing a required certificate, he was confident the TA would conditionally accept him as the Quality Engineer on the Myrtle-Wycoff Project while he obtained that certificate.  (Aneja Aff. ¶9).  In fact, since Defendant's proposed Project Manager, George Mantis, did not have the specified experience on TA projects, Defendant attempted to use Aneja's experience with the TA to get Mantis approved.  (Ex. L, 49:16-52:8, 123).  Defendant claims it eventually withdrew its bid for the Myrtle Wycoff project because the TA was not satisfied with the quality of the management team Defendant had proposed.  (Malakidis Dep. 83:13-21).

Aneja then began working on the Two Stations/Woodlawn-Fordham & Jerome Avenue Project, with the title of Director of Quality Control/Project Management.  (Aneja Dep. 158:5-14, 169:25-170:10).  His project management responsibilities included getting the drawings for the site's two elevators approved, assisting the official TA Project Manager with reviewing the schedule and progress payment forms, assisting with design issues, attending job meetings, working on the project's structural steel design, and responding to requests for information.  (Aneja Dep. 169:25-170:16, 206:16-209:6).  Aneja remained on that project until Defendant fired him on May 7, 2004. (Aneja Dep. 169:14-170:4).

In December 2003, while Aneja was working on the Two Stations Project, Defendant proposed him as the Quality Control Manager on the Three Historic Stations Project. (Aneja Dep. 179:18-23). Defendant knew Aneja did not meet the TA's specifications for that position, namely a Quality Engineer Certification and five year's of Quality Engineer experience. (Malakidis Dep. 87:11-25, 89:6-14, 90:20-25). During the hearing the TA scrutinized Aneja's experience and qualifications because Defendant submitted an incorrect resume that did not reflect all of his relevant credentials. (Aneja Aff., ¶11). Although the TA requested Aneja's correct resume after the hearing, Defendant did not bother to submit it. (Aneja Aff., ¶11; Ex M pp. 145-146).

Abdul Muqtadir, the TA's Construction Manager on the Three Historic Stations Project, admitted that if Aneja was not approved as the Quality Engineer on the Three Historic Stations Project, the TA would not have had any problem if Defendant had assigned him to any other position on that project. (Muqtadir Dep. 59:9-15, 60:3-62:8; Ex M 117:17-24).

## IV.     Defendant's Three Inconsistent Explanations For Firing Aneja

Defendant has given three inconsistent explanations for why it fired Mr. Aneja. At the EEOC, Defendant claimed its "decision to terminate Aneja was driven entirely by his performance and numerous complaints from the [TA]." (Ex J). Defendant has not provided any evidence supporting this claim.

In discovery, Malakidis testified that he made the decision to fire Aneja in May 2004 because Aneja was not effectively resolving issues related to the elevators on the Two Stations Project, and because Defendant was "running out of options" as far as assigning Aneja to projects. (Malakidis Dep. 98:19-25, 99:2-13, 104:14-25). However, the approval of the project's elevator drawings was running more than 90 days behind schedule before Aneja was assigned to that project, and he succeeded in getting the TA's approval for the drawings in March 2004. (Aneja Aff. ¶12).

Moreover, Aneja was still working on the Two Stations Project when Defendant fired him.  (Aneja Aff. ¶13).  That project continued for another 18 months after Defendant fired him.  (Candreva Dep. 41:22-25).

In its brief, Defendant claims it fired Aneja because of his testimony at the Three Historic Stations Project qualification hearing in December 6, 2003.  (Def. Br., p. 11, 13).  Five months passed between that qualification hearing and Malakidis' decision to fire Aneja on May 7, 2004.

Around the time of Aneja's termination, Defendant hired Ahmed Zubin to replace him as an Assistant to the Project Manager and hired Federico Palilio as a Quality Engineer.  (Aneja Aff. ¶14 ; Candreva Dep. 24:19-25:21, 39:25-40:2; Ex. G-I).  Defendant failed to provide Zubin's national origin in discovery, but he was in his mid-30's when Defendant hired him.  (Candreva Dep. 39:25-40:5, Ex. G-I, O).  Palilio is an individual of Filipino decent, whose age Defendant failed to provide in discovery.  (Ex. G-I, O).

## LEGAL ARGUMENT

### I.    Defendant's Motion Should be Denied Because it Failed to Comply with Local Civil Rule 56.1

Defendant's Motion should be denied because it failed to provide a separate statement of facts, as required by Local Civil Rule 56.1(a).  That rule states that:

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there <u>shall</u> be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is not genuine issue to be tried.  Failure to submit such a statement may constitute grounds for denial of the motion.

L. Civ. R. 56.1(a) (<u>emphasis</u> <u>added</u>).  Defendant failed to provide such a statement.

A party cannot substitute an Affirmation for a Rule 56.1(a) statement.  <u>O'Keefe v. Arbon Equipment Corporation</u>, 399 F.Supp.2d 478, 482 (SDNY 2005).  Any facts that are not properly submitted or supported in accordance with Local Civil Rule 56.1 cannot be considered in support of

a motion for summary judgment. <u>Chitoiu v. UNUM Provident Corp. et al.</u>, 2007 WL 1988406, *1 n1 (SDNY 2007), <u>citing</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003).

Defendant failed to comply with Local Civil Rule 56.1. Rather than annex a separate Statement of Facts, it merely provided an Affirmation from Malakidis and its attorney which mirror parts of Defendant's brief, including legal arguments. Thus, the Court should deny Defendant's motion, without even reaching its merits, because it violates Local Civil Rule 56.1.

## II.    Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of showing there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. <u>Bickhardt v. Ratner</u>, 871 F.Supp. 613, 616 (SDNY 1994). The Court's role is not to decide issues of fact, but to determine whether the evidence is "so one-sided" that one party must prevail as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). If there is "any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004). Summary judgment should be denied if there is "any source from which a reasonable inference could be drawn in favor of the nonmoving party." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994).

As this Court has recognized, "[g]reater caution must be exercised . . . in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue." <u>Lennon v. New York City</u>, 392 F.Supp.2d 630, 637-38 (SDNY 2005), <u>citing</u> <u>Belli v. Pendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999). This is because "employers are rarely so cooperative as to include a notion in the personnel file that the [action complained of] is for a reason expressly forbidden by

law." Id. at 638, quoting Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and citation omitted).

As detailed below, there are a myriad of material factual issues in this case which can only be resolved by a fact finder, including whether Defendant's reason for Aneja's termination was a pretext for discrimination, and whether Defendant paid Aneja less than similarly situated employees. Therefore, Defendant's motion for summary judgment should be denied in its entirety.

### III.   Defendant Terminated Aneja Because He Was Indian and 67 Years Old

### A.   Aneja Established a *Prima Facie* Case of National Origin and Age Discrimination

National origin and age discrimination claims brought under Title VII, the ADEA and the New York State Human Rights Law are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376 (2d Cir. 2001) (Title VII); Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000) (ADEA); Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir. 1999) (NYSHRL).  The first step of that framework requires the plaintiff to establish a *prima facie* case.  Reeves v. Sanderson Plumbing Prods., Inc., 530 US 133, 142 (2000).  To do so, the plaintiff must show: (1) he was a member of a protected group; (2) he was qualified for his position; (3) his employment was terminated; and (4) the termination occurred under circumstances giving rise to an inference of discrimination. Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001); Schnabel, 232 F.3d at 87.

The Second Circuit describes "the evidence necessary to satisfy this initial burden as 'minimal' and 'de minimus.'" Zimmermann, 251 F.3d at 380-81, citing Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001) and Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).  Thus, for example, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice the required inference of discrimination at the *prima facie* stage."

Zimmermann, 251 F.3d at 381, citing Tarshis v. Riese Organization, 211 F.3d 30, 36 (2d Cir. 2000)

and Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1239 (2d Cir. 1995). Alternatively, a plaintiff

can establish this by showing other circumstances giving rise to an inference of discrimination, such

as preferential treatment to employees outside the protected class, the systematic removal of the

employee's job duties, a pattern of recommending the plaintiff for positions for which he is not

qualified, or the failure to consider him for positions for which he is qualified.  Chertkova v.

Connecticut General Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996), citing Washington v. Garrett, 10

F.3d 1421, 1434 (9th Cir.1993); Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d

1219, 1225 (2d Cir. 1994); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 205 (2d Cir.1995).

Defendant does not contest that Aneja has established the first three elements of the *prima

facie* case, implicitly conceding that he has.  (Def. Br. p.4).  In any event, he meets the first prong of

the *prima facie* case because he is of Indian national origin and was over 40 years old when Defendant

fired him.  (Aneja Dep. 23-25, 33:23-25, 34:15-25).  He meets the second prong of the *prima facie*

case by offering evidence that he was qualified for his position.  (Malakidis Dep. 58:12-14, 84:21-25,

85:1-8; Balagangeyan Dep. 11:20-25, 43:23-25, 44:2-4).  He meets the third prong of the *prima facie*

case because Defendant fired him. (Malakidis Dep. 104:13-23 and Aneja Dep. 205:18-25).

Aneja has also established the fourth prong of the *prima facie* case because Defendant

replaced him with Zubin and Palilio, two younger, non-Indian individuals.  (Aneja Aff., ¶14;

Candreva Dep. 24:19-25:21, 39:25-40:2; Ex. G-I).  Zubin's was in his mid-30's when Defendant

hired him, and Palilio is an individual of Filipino decent.  (Candreva Dep. 39:25-40:5, Ex. G-O).

Since Defendant refused to provide Palilio's age or Zubin's national origin in response to an

Interrogatory seeking this information (Ex. G-I, O), Aneja requests an adverse inference that Zubin

is not of Indian National Origin and Palilio is substantially younger than him.  See, e.g., Residential

Funding Corp. v. Degeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002) ("[w]here, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including . . . giv[ing] an adverse inference instruction").

In the alternative, Aneja can establish the fourth prong of the *prima facie* case with regard to his age discrimination claim because Defendant replaced him on the Tunnel Lighting Project with Naweed Chaudri, a substantially younger, less experienced individual.  Haskell v. Kaman Corp., 743 F.2d 113, 122 (2d Cir.1984).  (Malakidis Dep. 81:23-25; 82:17-25).  At the time, Chaudri was 48 years old and Aneja was 67 years old.  (Aneja Aff. ¶2).

Aneja can also establish the fourth prong of the *prima facie* case through evidence that Defendant gave preferential treatment to its younger, Greek and other Caucasian employees.  All four individuals in Defendant's upper management are Greek.  (Malakidis Dep. 11:3-18).  Approximately 25% of Defendant's project management team is Greek.  (Malakidis Dep. 8:16-10:10).  In fact, every Project Manager on the projects Aneja worked on were Caucasian, and half were Greek.  (Ex. G-I).  Every Assistant Project Manager/Project Engineer was Caucasian, and all but one was Greek.  (Id.).  In contrast, only one of the 11 employees in other management positions on those projects was Caucasian (that individual is also Greek).  (Id.).  Not coincidentally, Defendant paid its Project Managers an average of $123,516 in annual compensation, and its Assistant Project Managers/Project Engineers an average of $94,625.  (Id.).  In contrast, it gave its Quality Managers an average of only $91,166 per year, and its Quality Inspectors, Assistant Quality Managers and Project Engineers an average of only $71,425.  (Id.).

Despite the evidence that Aneja was replaced by someone outside of his protected groups and that Defendant gave preferential treatment to its younger Greek and Caucasian employees,

Defendant argues that he failed to establish the fourth prong of the *prima facie* case.  (Def. Br. p.4).

Specifically, Defendant spends five pages discussing Aneja's job performance at Wenger, and claims

he was responsible for Wenger's default on the Yankee Stadium Project.  (Def. Br. pp. 7-11).

Aneja's job performance at Wenger has nothing to do with the reason Defendant fired him.  (Aneja

Dep. 64:24-25).  But even if it did, Aneja had no fault in Wenger defaulting.  (Aneja Dep. 93:14-17,

96:3-6, 127:25-131:11).  In the testimony Defendant relies on in support of this argument, Aneja

merely testified that one of the reasons Wenger defaulted was because he followed Wenger's

instruction and aggressively pursued its claims against the TA, which, as he predicted, contributed to

the project being delayed.  (Def. Br. pp. 9-10, <u>citing</u> Aneja Dep. 79:17-22, 130:10-131:5).

Within its Brief, Defendant even recognizes that a fact dispute regarding Aneja's job

performance at Wenger, stating that:

> Aneja also claims that the client had a higher level of satisfaction with his work than
> other employees.  Aneja's assertions are directly contradicted by Abdul Muqtadir,
> Transit's [Project Engineer] who worked on the [Yankee Stadium Project] when
> Aneja was [the TA's designated] Project Manager for Wenger and later when Aneja
> worked for MA as a Senior Project Manager.

(Def. Br., p. 7; Muqtadir Dep. 7:24-8:10).  Defendant did not provide any evidence supporting this

claim, which is contradicted by the TA which could not recall any complaints about Aneja's job

performance and otherwise had positive things to say about his work.  (Muqtadir Dep. 14:21-25;

Balagangeyan Dep. 6:24-8:7, 11:20-12:12, 16:11-16, 38:24-39:7, 43:23-44:4; Masood Dep. 13:5-7). To

the extent it is relevant and there is a *bona fide* fact dispute, this dispute must be decided by a jury.

###    B.    A Jury Can Infer Pretext for Discrimination Because Defendant's Proffered Reason for Firing Aneja is Weak, Implausible, Inconsistent and Contradictory

Once the plaintiff sets forth a *prima facie* case of discrimination, the burden shifts to the

defendant to articulate a non-discriminatory reason for the adverse employment action.  <u>Woodman</u>

<u>v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d. Cir. 2005).  The plaintiff then must show that "the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves</u>, 530 U.S. at 143.  To survive a motion for summary judgment, the plaintiff only needs to "offer evidence 'sufficient to support a reasonable inference that prohibited [age or race] discrimination occurred.'" <u>Woodman v. WWOR TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005), <u>quoting</u> <u>James v. N.Y. Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000).  To do so, "the plaintiff does not necessary have to show that the defendant's asserted non-discriminatory reasons did not play any role in the termination decision, but can merely show that a discriminatory reason was "at least one of the motivating factors." <u>Thomas v. iStar Financial, Inc</u>., 438 F.Supp.2d 348, 358 (SDNY 2006), <u>quoting</u> <u>Vergara v. Yonkers Pub. Schs.</u>, 386 F.2d 377, 384-85 (SDNY 2005) (<u>internal quotations</u> <u>omitted</u>).

One way a plaintiff can "establish pretext and thereby successfully oppose summary judgment [is] by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-discriminatory reason for its action." <u>Cruse v. G & J USA Publ'g</u>, 96 F.Supp.2d 320, 329 (SDNY 2000); <u>Reeves</u>, 530 U.S. at 147 ("[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").  This is because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." <u>Dodson v. CBS Broadcasting Inc., et al.</u>, 2004 WL 1336231 *19 (SDNY 2004) (unpublished).

### 1.      A Jury Can Infer Pretext Because Defendant Has Offered Inconsistent and False Explanations for Firing Aneja

Defendant has given three different explanations for why it fired Mr. Aneja, each of which contradicts the others and is demonstrably false.  At the EEOC, Defendant claimed its "decision to terminate Aneja was driven entirely by his performance and numerous complaints from the [TA]."

(Ex J).  However, Defendant has not provided any evidence supporting this claim, which is contradicted by the TA, which could not recall any complaints about Aneja's job performance and otherwise had positive things to say about his work.  (Muqtadir Dep. 14:21-25; Balagangeyan Dep. 6:24-8:7, 11:20-12:12, 16:11-16, 38:24-39:7, 43:23-44:4; Masood Dep. 13:5-7).

In contrast, Malakidis testified that he made the decision to fire Aneja in May 2004 because he was not satisfied with Aneja's job performance on the Two Stations Project, and because Defendant was "running out of options" as far as assigning Aneja to new projects.  (Malakidis Dep. 98:19-25, 99:2-13, 104:14-25).  In addition to the absence of any evidence that Aneja's job performance was dissatisfactory, Malakidis's claim that Defendant was running out of options for Aneja is false.  In fact, Aneja was actively working on the Two Stations Project when Defendant fired him.  (Aneja Aff.  ).  That project continued for another 18 months thereafter.  (Candreva Dep. 41:22-25).

Malakidis claims he had to remove Aneja from the Two Stations Project because he was not effectively resolving issues related to the project's elevators.  (Malakidis Dep. 98:19-25, 99:7-13, 104:14-25).  However, the approval of the elevator drawings was already more than 90 days behind schedule before Aneja was assigned to that project, and Aneja succeeded in getting the TA's approval for the elevators drawings in March 2004, before Defendant decided to fire him.  (Aneja Aff. ¶12).

Finally, in its brief Defendant argues that it fired Aneja because of his testimony at the Three Historic Stations Project qualification hearing in December 6, 2003.  (Def Br. 11-14).  Not only is this contradicted by Malakidis' testimony and Defendant's position with the EEOC, but it is illogical that Defendant would have waited until 5 months after the qualification hearing if it really fired him because of his testimony.

In sum, the numerous inconsistencies and contradictions between Defendant's three explanations for firing Aneja support a reasonable inference that his termination was a pretext for discrimination.

**2.       A Jury Can Infer Pretext Because Defendant Never Asked the TA to Waive the Specifications Defendant Always Knew Aneja Did Not Meet**

In its brief, Defendant claims the reason it fired Aneja's was because of his "inability to directly answer a single question posed by the TA during a qualification hearing" for the Three Historic Stations Project.  (Def. Br. 11, 13; Redmond's Aff. ¶¶16, 40; Malakidis' Aff. ¶¶14, 33, 40). However, a jury can find that Defendant's explanation is a pretext for discrimination since it knew Aneja did not meet all of the TA's job specifications for the position of Quality Engineer on that project before it submitted Aneja's name for that position, but never made a good faith effort to get the TA to waive those specifications.

The TA publishes written specifications for the key positions on its projects, including Quality Engineer.  (Balagangellan Dep. 44:5-45:5; Muqtadir Dep. 58:2-13).  Those specifications vary from project to project.  (Id.).  A general contractor that has experience on TA projects, like Defendant, would know the specifications for the key positions on a project before it proposes employees for one of those positions.  (Id.).

However, the TA often waives some of its specified requirements.  (Aneja Dep. 146:23-147:2; Myrtle-Wycoff 28:8-30:14, 37:13-15; Aneja Aff., ¶8).  For example, it waived the requirement of five year's of experience the first time it made Larry Pappas a contractual Project Manager. (Pappas Dep. 44:9-18).

Defendant proposed Aneja as the Quality Engineer on the Three Historic Stations Project, even though it knew he did not meet the TA's specifications for that position, namely a Quality Engineer Certification.  (Malakidis Dep. 87:11-25, 89:6-14, 90:20-25).  During the hearing the TA

scrutinized Aneja's experience because Defendant submitted the incorrect resume for Aneja that did not reflect all of his relevant experience and qualification.  (Aneja Aff., ¶11).

By proposing Aneja for a position for which it knew he did not meet the specifications and providing the incorrect resume, Defendant put him in a difficult situation.  It is not surprising his responses seemed evasive or non-responsive.  (Aneja Dep. 182:18-183:5).

Moreover, Defendant never bothered to provide Aneja's correct resume to the TA after the qualification hearing.  (Ex. M, p. 146).  As a result, the TA could not conditionally approve him as the Quality Engineer for the Three Stations Project.  (Aneja Aff. ¶11).  If Defendant really wanted Aneja to be the Quality Engineer on that project, it is weak and implausible to believe it would have submitted his name knowing he did not meet the job specifications, and then fail to take the steps necessary to convince the TA to waive those specifications.

### IV.     Aneja Established a *Prima Facie* Case of Discriminatory Disparate Pay

### A.     Defendant Paid Aneja Substantially Less Than Similarly Situated Project Managers

To establish a *prima facie* case in a disparate pay case, a plaintiff must offer evidence that: (1) he was a member of a protected class; (2) he was paid less than similarly situated non-members of his protected class; and (3) he was underpaid under circumstances giving rise to an inference of discrimination.  Thomas, 438 F.Supp.2d at 358 citing Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F.Supp.2d 377, 383 (SDNY 2002), aff'd, 75 Fed. Appx. 846 (2d Cir. 2003).  To avoid summary judgment, a plaintiff must produce some evidence to show that "he was paid less than similarly situated employees who where not members of his protected class."  Id. at 383, citing Belli, 191 F3d at 139.  Similarly situated employees means employees who are "substantially similar as to specific work duties, education, seniority, and performance history."  Simpson v. Metro-North Commuter R.R., et al., 2006 WL 2056366 *7 (SDNY 2006) (unpublished), citing DeJesus v. Starr Technical

Risks Agency, Inc., 2004 WL 2181403 *9 (SDNY 2004) (unpublished); Quarless, 228 F.Supp.2d at

383.  The question of "[w]hether two employees are similarly situated ordinarily presents a question

of fact for the jury."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d. Cir. 2000), citing Taylor v.

Brentwood Union Free Sch. Dist., 143 F.3d 679,684 (2d Cir. 1998), cert. den'd, 525 US 1139 (1999),

Hargett v. National Westminister Bank, USA, 78 F.3d 836, 839-40 (2d Cir. 1996), and Tomaka v.

Seiler Corp., 66 F.3d 1295, 1312 n. 11 (2d Cir. 1999).

Defendant assumes Aneja can meet the first and third prong of the *prima facie* case of his

disparate pay claim, only arguing he cannot establish the second prong of his claim.  (Def. Br., p. 4).

In any event, Aneja has established the first prong of his *prima facie* case of age and national origin

discrimination because he is Indian and was nearly 67 years old when Defendant terminated him.

(Aneja Dep. pp. 23-25, 33:23-25).  As set forth in Section III above, a jury can infer that Defendant

discriminated against Aneja because of his national origin and age.

Aneja has a B.S. Degree in Civil Engineering and a Professional Engineer license.  (Aneja

Dep. 27:4-24, 39:11-17).  He has been working in the design/construction engineering field for

more than 40 years.  (Aneja Dep. 18:8-20, 29:6-44:12, 62:8-9, 64:8-13, 72:13-17).  He spent the

majority of his time working for Defendant as a Project Manager.  When Defendant took over the

Yankee Stadium Project, he was the most senior of the four Project Managers and therefore

undertook the most important and most difficult assignments.  (Aneja Dep. 90:19-22, 111:7-112:6,

222:17-24; Pappas Dep. 84:15-87:9, 101:11-103:8, 113:5-11, 115:5-13; Aneja Aff. ¶4).  He remained

in this position until the project was completed July 25, 2002.  (Pappas Dep. 71:14-20, Aneja Dep.

101:2-5, 222:17-24; Aneja Aff. ¶4).  Likewise, as detailed in the Statement of Facts above, Mr. Aneja

performed Project Manager duties on each of his final two assignments, the Tunnel Lighting Project

and the Two Stations Project.  (Aneja Dep. 169:14-170:16, 206:16-209:6; Aneja Aff. ¶10).

17

Even though Aneja was more experienced and had at least as much education as Defendant's other Project Managers, it paid him only $92,000 per year, while it paid its other Project Managers an average of $123,500 per year.  (Ex. G-I).  Accordingly, a reasonable jury can find in Aneja's favor with respect to his disparate pay claim.

    **B.**    **Even Assuming Aneja Was Not a Project Manager, Defendant Paid Him Less Than Its Assistant Project Managers/Project Engineers**

Even assuming *arguendo* Aneja was not similarly situated to Defendant's other Project Managers, at the very least his comparators include Defendant's Assistant Project Managers/Project Engineers.  Defendant's Assistant Project Managers/Project Engineers were responsible for assisting the Project Managers.  The Assistant Project Managers/Project Engineers ranged from 26 to 28 years old.  (Ex. G-I).  Based on that fact alone, none of Defendant's Assistant Project Manager/Project Engineers could have had anywhere near the 40 years of experience Aneja had.  Additionally, unlike Aneja, none of Defendant's Assistant Project Managers/Project Engineers had a Professional Engineer's license.  Based on Aneja's greater qualifications and more substantial experience and job duties, his annual compensation should have far exceeded the $94,625 Defendant paid, on average, to its much younger Greek and Caucasian Assistant Project Managers/Project Engineers.

    **C.**    **Defendant Underpaid Aneja Even in Comparison To Its Quality Managers/Engineers**

Without providing details regarding his job duties, Defendant claims Aneja was similarly situated to its Quality Managers/Engineers.  As set forth above, Aneja was primarily a Project Manager for Defendant, not a Quality Manager/Engineer.  But even assuming *arguendo* a jury concludes his compensation should be compared to Defendant's Quality Manager/Engineers, he was still underpaid.  Specifically, as set forth above, Aneja has extensive experience in the

design/construction engineering field, and has a Professional Engineer license.  (Aneja Dep. 18:8-20, 27:17-24, 29:6-39:6, 41:21-23, 43:5-44:12, 62:8-9, 64:8-13, 72:13-17).  He had more than five years of Project Management experience and additional experience working for the TA.  (Aneja Dep. 64:24-25, 66:14-17, 90:17-22).  None of Defendant's Quality Managers/Engineers had such extensive credentials or relevant experience.  Therefore, Aneja's yearly compensation should have substantially exceeded the average amount Defendant paid its Quality Managers/Engineers.  Nonetheless, he was paid essentially the average salary Defendant paid to its Quality Managers/Engineers.

## V.      Defendant is Not Entitled to Attorney's Fees

### A.      Defendant's Application for Attorneys Fees Should Be Denied as Premature

An application for attorney fees under Title VII must be made within a reasonable time <u>after</u> final judgment.  <u>Cush-Crawford v. ADCHEM Corporation</u>, 234 F.Supp.2d 207, 210-11 (EDNY 2002) (<u>emphasis</u> <u>added</u>), <u>citing</u> <u>Environmental Defense Fund, Inc. v. Environmental Protection Agency</u>, 672 F.2d 42 (D.C.Cir. 1982).  Thus, it is inappropriate and premature for Defendant to seek fees as part of its motion for summary judgment, and its application should be denied.

### B.      Defendant's Application for Attorneys Fees Should Be Denied Because Aneja Has a Valid Claim of National Origin and Age Discrimination

But even assuming Defendant's motion for fees were timely, Defendant cannot establish it is entitled to fee.  A prevailing defendant is entitled to recover its fees from the plaintiff only "upon a finding that plaintiff's action was frivolous, unreasonable, or without foundation."  <u>Lee v. Glessing</u>, 2006 WL 2524185 *2 (NDNY 2006), <u>citing</u> <u>Christianburg Garment Co. v. Equal Employment Opportunity Comm'n</u>, 434 US 412, 421 (1978).  The term "frivolous, unreasonable, or without foundation" means "groundless . . . rather than simply that the plaintiff has ultimately lost his case."  <u>Id</u>.  Moreover, "[t]he fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees in favor of the defendant."  <u>LeBlanc-Sternberg v. Fletcher</u>,

143 F.3d 765, 770 (2d Cir. 1998).

Even assuming the Court finds Defendant's petition for attorney's fees is timely, as discussed above Aneja has not only established a *prima facie*, but also has enough evidence to survive summary judgment.  At the very least, he has more than enough evidence of discrimination to establish that his claims were not frivolous, unreasonable, or without foundation.

Defendant's application for fees is also deficient in that it provides no evidence that would permit the Court to award attorney's fees, such as how much time counsel spent on this case or information regarding counsel's reasonable hourly rate.

<u>**CONCLUSION**</u>

Therefore, it is respectfully submitted that Defendant's motion for summary judgment and for fees should be denied in its entirety.

Respectfully submitted,

  /s Jonathan I. Nirenberg  
Jonathan I. Nirenberg

20